1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6 EUREKA DIVISION

7

| | |
|---|---|
| 8  DEONTE R. R.,[1] | Case No.  19-cv-03251-RMI |
| 9        Plaintiff, | |
| 10    v. | **ORDER ON CROSS MOTIONS FOR REMAND** |
| 11  ANDREW SAUL, | Re: Dkt. Nos. 38, 39 |
| 12        Defendant. | |

13

14        Plaintiff, seeks judicial review of an administrative law judge ("ALJ") decision denying his

15 application for supplemental security income under Title XVI of the Social Security Act.

16 Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals

17 Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security

18 which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to

19 the jurisdiction of a magistrate judge (dkts. 20 & 22), and both parties have moved for remand

20 (dkts. 38 & 39) while disagreeing only about the nature of the remand. For the reasons stated

21 below, Plaintiff's motion for remand for calculation and payment of benefits is granted, and

22 Defendant's motion for remand for further proceedings is denied.

23                                        **LEGAL STANDARDS**

24        The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be

25 conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set

26 aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal

27 _____

28 [1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

United States District Court
Northern District of California

1   error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase

2   "substantial evidence" appears throughout administrative law and directs courts in their review of

3   factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

4   Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as

5   adequate to support a conclusion." *Id.* at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S.

6   197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In

7   determining whether the Commissioner's findings are supported by substantial evidence," a

8   district court must review the administrative record as a whole, considering "both the evidence

9   that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v.*

10   *Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where

11   evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676,

12   679 (9th Cir. 2005).

**PROCEDURAL HISTORY**

13

14       In September of 2016, Plaintiff filed an application for supplemental security income,

15   alleging an onset date of January 3, 2012. *See* Administrative Record "*AR*" at 11.[2] As set forth in

16   detail below, the ALJ found Plaintiff not disabled and denied the application on May 21, 2018. *Id.*

17   at 11-22. The Appeals Council denied Plaintiff's request for review on April 11, 2019. *See id.* at 1-

18   4. In this court, Defendant confesses error and submits that a remand for further proceedings is

19   necessary due to the ALJ's errors in analyzing the medical opinion evidence as well as Plaintiff's

20   subjective complaints (*see* Def.'s Mot. (dkt. 39) at 1-2), however, Plaintiff submits that the case

21   should be remanded with instructions to calculate and award benefits without further proceedings

22   (*see* Pl.'s Mot. (dkt. 38) at 23).

**SUMMARY OF THE RELEVANT EVIDENCE**

23

24       Born in 1991 to parents that were afflicted with chronic homelessness and substance abuse

25   problems, Plaintiff experienced trauma during his early years, such that he began psychotherapy

26   when he was only eight years old. *See AR* 424-25, 523-25. Plaintiffs' early years were largely

27

28   [2] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to
     Docket Entry #29. *See* (dkts. 29-1 through 29-13).

United States District Court
Northern District of California

United States District Court
Northern District of California

spent living on the streets interspersed with occasional periods of respite in motel rooms. *Id*. at 523. During those years, he was a frequent witness to the beatings his mother endured at the hands of his father. *Id*. As recently as 2017, he reported that his father was still homeless but that his mother was in a substance abuse rehabilitation program. *Id*. at 523-24. More recently, due to his history of psychiatric problems, Plaintiff has been unable to manage social interaction and, thus, he has been living in a socially isolated state. *Id*. at 524.

While managing to graduate from high school, Plaintiff did so under a regime of special education and with the help of resource classes due to problems with his memory and his slow functioning. *Id*. Following high school, he attempted to complete some coursework at San Francisco City College, however, he was eventually forced to abandon that effort due to not having a stable place to live and not being able to pay his bills. *Id*. Thereafter, he briefly held a job as a security guard, however, Plaintiff lost that job due to difficulties in arriving on time to start his shift, and due to being slow in the performance of his duties once there. *Id*. As a youngster, he had been incarcerated several times for various misdemeanors including being jailed for stealing clothes at a time when he was too poor to support himself. *Id*. This was the same period which saw the onset of his history of head trauma and unconsciousness due to having his head smashed onto the concrete four times during a fight. *Id*.

Between 2016 and 2017, Plaintiff's primary care providers at Lifelong Trust Medical Care diagnosed him with a number of conditions that included: a recurrent and severe case of major depressive disorder with psychotic features; posttraumatic stress disorder ("PTSD"); and, a schizoaffective disorder of the depressive type. *Id*. His treatment providers found that Plaintiff also suffered from anxiety, agitation, paranoia in the community, command auditory hallucinations, anhedonia, disorganization, tearfulness, feeling overwhelmed, negative thoughts, isolation from peers, as well as difficulties in handling conflict, sleeping, and setting boundaries. *Id*. As for the auditory hallucinations, Plaintiff reported hearing "voices that were mean and degrading and telling him to do bad things"; and, in order to mitigate the effects of these symptoms, he has habitually avoided public places or the company of others, preferring instead to focus his attention on tasks like drawing, which helped to keep him calm. *Id*. at 534-25. In the course of their

treatment sessions, Plaintiff's primary care providers found that he presented as very childish and immature, and that he frequently manifested tangential thinking, a flat affect, impaired insight and judgment, problems with attention and concentration, and depressive paranoid ruminations and preoccupations. *Id*. at 525.

**_Medical Evidence_**

The record in this case reflects that Plaintiff underwent three consultative psychological evaluations between January of 2016 and August of 2017, culminating in three separate psychological reports. *See id*. at 424-28, 470-73, 522-35. Additionally, in January of 2018, Dr. Ted M. Aames, his treating psychologist at Lifelong Trust Medical Care completed and submitted a Mental Impairment Questionnaire in which he also opined about Plaintiff's impairments and their consequential limitations on his ability to work. *Id*. at 536-40.

_Consultative Examiners_

In January of 2016, Plaintiff was referred for an evaluation by Jonathan Howard, Psy.D., "for the purposes of providing an assessment of occupational disability and diagnostic impressions to the Social Services Administration." *Id*. at 424. Dr. Howard's psychological evaluation included a clinical interview, a mental status examination, an administering of both parts of the Trail Making Tests ("TMT"), the Fourth Edition of the Wechsler Adult Intelligence Scale ("WAIS-IV"), and the Fourth Edition of the Wechsler Memory Scale ("WMS-IV"). *Id*. Regarding daily activities, Plaintiff reported to Dr. Howard that he was living with a friend in Oakland at the time, that he was receiving no income, and that he required assistance with tasks as basic as cooking, shopping, and cleaning. *Id*. He also informed Dr. Howard about his history of depression, anxiety, and his difficulties with learning and memory – all of which were rooted in his early adolescence. *Id*. at 425. In addition to his longstanding issues with depressed mood and anxiety, Plaintiff also reported sleep disturbances, tearfulness, decreased appetite, decreased energy, irritability, paranoia in relation to pervasive thoughts that people are trying to hurt him, as well as impaired faculties regarding memory and concentration. *Id*. In describing his four-year struggle with auditory hallucinations, as well as his history of suicidal ideations, Plaintiff also noted that he had entertained suicidal thoughts as recently as two weeks before the evaluation. *Id*. The mental

United States District Court
Northern District of California

status examination revealed issues with his intermediate memory in that he was unable to recall 2 out of 3 words after five minutes; his attention and concentration also appeared impaired in that he was unable to count backwards by units of three or to perform a simple arithmetic operation by subtracting $7.50 from $18.00. *Id.* Upon administering the WAIS-IV instrument for cognitive function, Dr. Howard calculated Plaintiff's full scale IQ score at 61, placing him in the "extremely low" range of intellectual function, or, at the bottom 0.5 percentile. *Id.* at 426. Similarly, Plaintiff's performance on the WMS-IV indicated severe impairment in the various aspects of his memory function. *Id.*

Dr. Howard diagnosed Plaintiff with an unspecified mood disorder that was attended with depressed, anxious, and psychotic features; an unspecified cognitive disorder; a substance abuse disorder related to cannabis consumption; and, Dr. Howard also noted that an unspecified psychotic disorder might need to be ruled out. *Id.* The cognitive disorder diagnosis was based on the above-discussed test results which indicated slowed psychomotor ability and difficulty in shifting mental sets, while showing moderate impairment as to verbal comprehension, but severe impairments as to perceptual reasoning, working memory, processing speed, immediate memory, and the ability to learn or recall auditory or visual information. *Id.* at 426-27. In the end, Dr. Howard found that Plaintiff's overall cognitive abilities were severely impaired. *Id.* at 427. As to Plaintiff's abilities, Dr. Howard opined that he suffered from a moderate to marked impairment in his ability to understand and execute simple instructions and tasks, but that he suffered from marked impairment in the following categories: understanding and executing more complex instructions and tasks; paying attention and concentrating in ordinary work situations; adapting to changes in the working environment; interacting with people; maintaining pace and persistence on tasks; performing activities within a set schedule; and, maintaining regular attendance. *Id.* At bottom, Dr. Howard concluded that Plaintiff would even "need assistance in managing his funds towards his own best interest." *Id.*

A few months later, in August of 2016, Plaintiff was referred to Aparna Dixit, Psy.D., by the state disability agency for another consultative examination. *Id.* at 470-73. At the outset it should be noted that it is unclear what records, if any, Dr. Dixit reviewed in conjunction with this

evaluation as her report only mentions that "available" records were reviewed without any further elaboration or mention of the records that were available for her review. *Id*. at 470. In any event, Dr. Dixit conducted a clinical interview and a mental status examination, while also administering the WAIS-IV, the WMS-IV, and the TMT. *Id*. On this occasion, Plaintiff's full scale IQ was determined to be 80 (while explaining the score to fall within the low average range); his index scores on the WMS-IV were determined to be 91 (auditory memory index) and 90 (visual working memory index), which Dr. Dixit characterized as falling within the average range; and, lastly, Plaintiff's performance on the TMT "suggested mild impairment in the domain of sequencing, organizing, and mental flexibility." *Id*. at 471-72. Assessing a GAF (Global Assessment of Functioning) Score of 61, Dr. Dixit diagnosed Plaintiff with Dysthemic Disorder (also known as persistent depressive disorder). *Id*. at 472. As to his work-related ability to function, Dr. Dixit found that Plaintiff suffered from no limitations whatsoever in the following areas: following and remembering simple instructions; maintaining adequate pace and persistence such as to perform single-step or two-step repetitive tasks; maintaining emotional stability and predictability; interacting with coworkers and supervisors; and, communicating (verbally or in writing) appropriately with others. *Id*. at 472-73. On the other hand, Dr. Dixit opined that Plaintiff suffered only mild limitations in the remaining categories of work-related functioning: following and remembering complex instructions; maintaining adequate persistence and pace such as to perform complex tasks; maintaining adequate attention and concentration; adapting to changes in the job routine; withstanding the stress of a routine workday; interacting appropriately with the public; and, performing tasks requiring mathematical skills. *Id*. Dr. Dixit also held the opinion that Plaintiff was incapable of managing his own funds. *Id*. at 473. Finally, it should be noted that Dr. Dixit's report was not very detailed and consisted of little more than 3 pages, much of which appears to be boilerplate. *See id*. at 470-73.

Almost exactly one year later, in August of 2017, Plaintiff was referred to Katherine Weibe, Ph.D., for another psychological evaluation; in the course of which, the following procedures were administered: the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"); the Annotated Mini Mental State Examination ("AMMSE"); the Clock

United States District Court
Northern District of California

1   Drawing test; the Barona IQ Estimate; the TMT; the Beck Depression Inventory ("BDI-II"); the

2   Beck Anxiety Inventory ("BAI"); and the Mental Status / Psychiatric Symptoms Sheet. *Id*. at 522,

3   526. In addition to these procedures, Dr. Weibe also conducted an extensive clinical interview and

4   a thorough review of Plaintiff's medical records from his psychotherapy treatment providers at

5   Lifelong Trust Medical Care spanning from August of 2016 to June of 2017 – all of which was

6   memorialized in Dr. Weibe's 14-page report. *Id*. at 523, 526.

7           Initially, based on her review of Plaintiff's medical records (all of which were dated *after*

8   the date of Dr. Dixit's above-discussed evaluation), Dr. Weibe noted that Plaintiff's treating

9   psychotherapists had diagnosed him with a severe and recurrent major depressive disorder, PTSD,

10  and a depressive type of schizoaffective disorder. *Id*. at 523. As a result of these conditions,

11  Plaintiff's medications include risperidone (an antipsychotic medication which, incidentally,

12  causes Plaintiff to suffer tremors) and trazodone (an antianxiety and antidepressant medication).

13  *Id*. As a result of the functional and mental status exams, Dr. Weibe made the following

14  observations and findings: that Plaintiff has impairments in insight, judgment, and reasoning

15  (affecting his ability to manage his personal affairs); that he refrains from shopping for himself

16  due to his fear of his urge to steal things; that he generally eats fast food or microwavable meals;

17  that despite finding cleanliness very important, when Plaintiff is depressed "he does not even

18  shower and does not go out anywhere"; that he sometimes has difficulties on public transportation

19  due to his paranoia; that he has problems making change or keeping track of money ("his

20  roommate does this for him"); that he evidenced a childlike manner and inexplicably referred to

21  himself in the third person; that he displayed a depressed mood coupled with tension, irritability,

22  and ambivalence; that he evidenced problems with memory coupled with the inability to discuss

23  prior traumatic events for fear of crying; that he evidenced tangential speech, a tendency to

24  become easily confused, frustrated, anxious, and impatient; that he expressed some suicidal,

25  paranoid, and delusional ideations; that he reported feelings of hopelessness, guilt, and

26  worthlessness, coupled with derogatory and command auditory hallucinations; and, that his

27  problems with insight, judgment, and reasoning were associated with his psychiatric and

28  personality disorder problems. *Id*. at 525-26.

United States District Court
Northern District of California

As to his test results, based on the Barona Estimate, Dr. Weibe found that Plaintiff's "premorbid overall IQ is estimated to be below average." *Id*. at 527. Regarding Plaintiff's abilities in the domains of attention, concentration, and calculation (as measured by the RBANS, the MMSE, and Part A of the TMT) Dr. Weibe found that Plaintiff suffers from severe impairments as evidenced by the fact that he could not do single-digit arithmetic operations without the use of visual aids, as well as by the fact that he was unable to spell a five-letter word ("world") backwards. *Id*. She also found Plaintiff to be severely impaired in his ability to plan, sequence, abstract, and organize based on his AMMSE performance, his inability to even complete Part B of the TMT, and his inability to draw the hands of a clock at the correct time in the Clock-Drawing Test. *Id*. Dr. Weibe also found that Plaintiff's linguistic faculties and his memory are also severely impaired in that his performance on the RBANS indicated immediate and delayed memory functions in the extremely low range (that is, below the 0.1 percentile). *Id*. at 527-28. Conversely, Dr. Weibe found that Plaintiff was unimpaired in the domain of visual/spatial abilities, and that he functioned with mild impairment in the domain of sensory/motor abilities. *Id*. at 528.

Plaintiff's emotional function – as measured by the Beck Depression and Anxiety Inventories – paints a disturbing picture. *Id*. at 528-31. Test results in this domain were indicative that Plaintiff suffers from severe depression while experiencing moderate anxiety. *Id*. at 528-29. When asked how he was feeling during Dr. Weibe's assessment, Plaintiff responded: "I want to kill myself – get away from everybody." *Id*. at 529. When asked if he could recall the first time that he felt that way, Plaintiff responded that he first wished he were dead at the age of five or six when he found out he has no family, and that since then, on numerous occasions "he has felt bad enough to want to kill himself." *Id*. To that end, Plaintiff reported having cut his arm as part of an attempted suicide about a year before the session with Dr. Weibe (i.e., on or about August of 2016). Plaintiff also reported his several-year history of auditory hallucinations which largely consist of command hallucinations (that is, voices that tell him to do things, some of which are good while others are not) as well as derogatory auditory hallucinations (such as voices that ridicule him). *Id*. at 530. Plaintiff also experiences visual hallucinations (such as seeing "goat ears on a jacket") which he interprets as "God let[ting] me see stuff other people don't see." *Id*.

8

1   In describing Plaintiff's "unresolved inner conflicts, with [a] history of complex trauma

2   from childhood," Dr. Weibe reported that Plaintiff was the victim of sexual abuse as a child

3   (between the ages of 5 and 7), and that even discussing his trauma causes him a great deal of

4   distress. *Id*. at 531. In short, Dr. Weibe opined that Plaintiff's history of trauma is rooted in those

5   episodes of childhood sexual abuse, his history of problems with learning and cognition, his being

6   made to witness the beatings his mother suffered at his father's hands during his formative years,

7   his being afflicted with chronic homelessness during large portions of his childhood and

8   adolescence, his long-term struggles with depression, anxiety, and attention, as well as his

9   experiences with command and derogatory auditory hallucinations. *Id*. Due to these conditions,

10  and due to Plaintiff's "tendencies for cognitive and perceptual distortions," Dr. Weibe added that

11  Plaintiff experiences significant difficulties with social interactions, which require him to remain

12  socially withdrawn such as to make it difficult for him to even be "able to perform reliably and to

13  relate and communicate effectively with supervisors, co-workers, and the public in a work

14  environment." *Id*. at 531-32. In short, Dr. Weibe diagnosed Plaintiff with: an unspecified trauma

15  and stressor-related disorder; a recurrent-episode major depressive disorder with psychotic

16  features and anxious distress; an unspecified intellectual disability; a schizoaffective disorder of

17  the depressive type; PTSD; and, kleptomania. *Id*. at 532. In essence, she concluded that Plaintiff's

18  various problems and impairments were interrelated and that each condition operates to worsen

19  the others in that his "cognitive functioning impairments appear to result from [a] history of

20  learning problems including likely intellectual disability since childhood[,] as well as his

21  psychiatric problems including psychosis, depression, anxiety, and trauma and stressor-related

22  symptoms." *Id*. On the basis of these diagnostic impressions and attendant findings and test

23  results, Dr. Weibe opined that Plaintiff's "psychiatric and cognitive problems will likely impair his

24  ability to work for at least two years." *Id*.

25  *Treating Psychologist*

26  The following year, on January 19, 2018, Plaintiff's treating psychologist and his social

27  worker at the Lifelong Trust Health Center in Oakland, California, jointly completed and

28  submitted a Mental Impairment Questionnaire on Plaintiff's behalf. *Id*. at 536-40. Therein, Ted

United States District Court
Northern District of California

Aames, Ph.D., and Kari Jennings-Parriott, LCSW, noted that Plaintiff had been under their care since April of 2016 with twice-monthly psychotherapy sessions for a period spanning nearly two years. *Id*. at 536. At the outset, Dr. Aames noted that his opinions as to Plaintiff's functioning were based on the course of his treatment as well as Plaintiff's history and medical file, the psychological evaluations and reports of other examiners, progress notes and office notes, as well as consultations with the supervising psychologist at the Lifelong Trust Health Center. *Id*. In this regard, Dr. Aames noted that Plaintiff's major depressive disorder has lasted and is expected to last more than 12 months, and that its severity interferes even with the basic activities of daily functioning. *Id*. Dr. Aames then catalogued the 21 consequential symptoms of Plaintiff's disorder as: significant deficits in complex attention, executive function, learning and memory; delusions or hallucinations; diminished interest in nearly all activities; sleep disturbance; decreased energy; difficulty concentrating or thinking; frequent distractibility; fatigue; involuntary and time-consuming preoccupation with intrusive and unwanted thoughts; detachment from social relationships; difficulty organizing tasks; disorganized thinking; depressed mood; thoughts of death or suicide; restlessness; irritability; distrust or suspiciousness of others; disproportionate fear or anxiety amounting to agoraphobia; inability in maintaining interpersonal relationships; difficulty in sustaining attention; and disturbances in mood and behavior. *Id*. at 537.

At bottom, Dr. Aames concluded that Plaintiff's abilities to function in *every* category of work-related function were attended with marked limitation (meaning that his ability to function was seriously limited, in that his performance in each of those categories would be precluded by more than 20%). *Id*. at 538-39. Thus, Dr. Aames opined that Plaintiff suffered marked limitations in the following areas: his ability to understand, remember, and apply information; his ability to interact with others; his ability to concentrate, persist, or maintain pace; and, his ability to adapt or mange himself. *Id*. Consequently, Dr. Aames opined that Plaintiff would be expected to be absent from work (as a result of his symptoms or his need for treatment) for more than 4 days per month, and that he should be expected to be off-task or precluded from functioning during more than 30% of any given workday. *Id*. at 539. Lastly, Dr. Aames noted that Plaintiff's conditions combine to minimize his capacity to adapt to changes in his environment or to demands that are not already

1    part of his daily life. *Id*. at 540.

2    <u>*Non-Examining State Agency Consultants*</u>

3           In February of 2016, H. Amado, M.D., a non-examining state agency consultant reviewed

4    Dr. Howard's report, as well as some unspecified quantity of Plaintiff's medical records and

5    rendered a number of opinions which appear to contradict one another to a significant degree. *See*

6    AR at 197-207. First, it was noted that another consultative examination might be necessary

7    because "[t]he evidence as a whole, both medical and non-medical is not sufficient to support a

8    decision on the claim," despite the fact that Dr. Howard had performed exactly such an

9    examination the previous month and Dr. Amado had reviewed that report. *Id*. at 200, 203.

10   Confusingly, Dr. Amado explained his opinion as being based on giving "great weight" to Dr.

11   Howard's opinion because Dr. Howard's opinion was congruent with both the medical evidence

12   of record and with the objective results of the administered tests. *Id*. at 204. Leaving little room for

13   ambiguity, Dr. Amado then repeated the fact that Dr. Howard had opined that Plaintiff experiences

14   marked limitations in performing even simple tasks, as well as marked limitations in working with

15   supervisors, coworkers, and the public. *Id*. at 201. Then, without any identifiable explanation, and

16   despite claiming to have given Dr. Howard's opinion "great weight," and despite noting that the

17   evidence was insufficient to support a decision on the claim, Dr. Amado somehow opined that

18   Plaintiff was "not significantly limited" in nearly all of the categories of work-related functioning

19   and concluded that "[w]ith psych treatment and abstinence from daily cannabis use [], it is

20   stipulated that claimant's potentially treatment-responsive psych condition will improve and

21   permit simple work on a sustained basis." *Id*. at 204-06. It should be noted that Dr. Amado's

22   opinion significantly predated the opinion of Dr. Weibe and the entire course of Plaintiff's

23   treatment with Dr. Aames, which culminated in the above-discussed report co-authored by Dr.

24   Aames in 2018.

25   <u>***Hearing Testimony***</u>

26          In pertinent part, at the hearing on this claim, the ALJ asked the Vocational Expert ("VE")

27   whether a person of Plaintiff's age, education, and experience could perform simple work at the

28   medium exertional level. *Id*. at 194. The ALJ further limited the "simple work" to which Plaintiff

United States District Court
Northern District of California

11

1    might be relegated as such that would be routine, repetitive, and limited by occurring in a low-

2    stress environment in that there would be only occasional decision-making, occasional changes in

3    the work setting, and only occasional (or no) interaction with the general public. *Id*. at 194-95. The

4    VE answered in the affirmative and posited that such a person would be able to fulfill the

5    requirements of a laundry worker, a hand packager, or a floor waxer. *Id*. at 195. When the VE was

6    asked whether there would be any possibility of employment in the national economy for such a

7    person but with an allowance for that person to be off-task 25% of the workday while being

8    allowed to miss work entirely "at least three times a month unscheduled and unexcused," the VE

9    responded in the negative. *Id*. at 196.

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

11         A person filing a claim for social security disability benefits ("the claimant") must show

12   that he has the "inability to do any substantial gainful activity by reason of any medically

13   determinable physical or mental impairment" which has lasted or is expected to last for twelve or

14   more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909. The ALJ must consider all evidence in

15   the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-

16   step sequential evaluation process to determine whether the claimant is disabled (*see id*. §

17   416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that

18   the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

19         Here, the ALJ set forth the applicable law under the required five-step sequential

20   evaluation process. *AR* at 12-13. At Step One, the claimant bears the burden of showing he has not

21   been engaged in "substantial gainful activity" since the alleged date on which the claimant became

22   disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be

23   substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that

24   Plaintiff had not engaged in substantial gainful activity since the alleged onset date. *AR* at 13. At

25   Step Two, the claimant bears the burden of showing that he has a medically severe impairment or

26   combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe

27   if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than

28   a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686

United States District Court
Northern District of California

1   (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). At Step Two, the ALJ found that Plaintiff

2   suffered from the following severe impairments: intellectual disability, recurrent and severe major

3   depressive disorder with psychotic symptoms, and a mood disorder. *Id*. at 13-14. However, the

4   ALJ failed to even mention, let alone discuss and analyze, Plaintiff's diagnoses for PTSD and

5   schizoaffective disorder of the depressive type.

6          At Step Three, the ALJ compares the claimant's impairments to the impairments listed in

7   appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the

8   burden of showing his impairments meet or equal an impairment in the listing. *Id*. If the claimant

9   is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful,

10  the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four.

11  *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or

12  combination of impairments that met or medically equaled the severity of any of the listed

13  impairments. *AR* at 13-16. Next, the ALJ determined that Plaintiff retained the RFC to perform

14  work at the medium exertional level but limited to simple, routine, and repetitive tasks, while

15  working in a low stress job involving only occasional decision-making and occasional changes in

16  the work setting; and, further limited to having no interactions with the general public, while

17  having only occasional interactions with co-workers. *Id*. at 16-21.

18         At Step Four, the ALJ determined that Plaintiff is unable to perform his past relevant work

19  because he has no past relevant work. *Id*. at 21. Lastly, at Step Five, the ALJ concluded, based on

20  the RFC, Plaintiff's age, education, and the VE's testimony, that there are jobs that exist in

21  significant numbers which Plaintiff could perform – namely, the ALJ found that Plaintiff could

22  perform the functions of a floor waxer, a hand packer, or a laundry worker. *Id*. at 21-22. Thus, the

23  ALJ then concluded that Plaintiff had not been under a disability, as defined in the Social Security

24  Act, since September 16, 2015, the date the application was filed. *Id*. at 22.

                                         **DISCUSSION**

26         Based on the record as described above, Plaintiff submits that this case satisfies the

27  conditions of the credit-as-true doctrine: because the ALJ failed to provide legally sufficient

28  reasons for rejecting this evidence; because, when properly credited, the evidence would require

United States District Court
Northern District of California

United States District Court
Northern District of California

1   the ALJ to find Plaintiff disabled on remand; because there are no outstanding issues that need to

2   be resolved before a disability determination may be rendered; and, because a review of the record

3   as a whole does not give rise to any serious doubt that Plaintiff is, in fact, disabled. *See* Pl.'s Mot.

4   (dkt. 38) at 23. Defendant agrees that the case is due to be remanded because the ALJ's

5   "subjective complaint and medical opinion analysis is deficient." Def.'s Mot. (dkt. 39) at 1.

6   However, Defendant contends that "[w]hile there is evidence of some positive psychiatric

7   symptoms, the record also contains numerous examinations showing normal memory, orientation,

8   and judgment," which in Defendant's view are "outstanding issues [that] must be resolved through

9   further administrative proceedings." *Id*. at 2. In support of the argument as to the necessity for

10  further proceedings, Defendant notes: (1) that Dr. Dixit's 2016 opinion reached the conclusion that

11  Plaintiff's work-related abilities are attended with little to no limitations; (2) that Helen Patterson,

12  Ph.D., a non-examining consultant, reviewed Plaintiff's file in September of 2016, and opined that

13  Plaintiff's conditions were attended with "mild limitations only"; and (3) that while Plaintiff had

14  told some person, in 2015, that he does not shop for food, prepare meals for himself, or care for

15  animals – Plaintiff's friend reported that he does on occasion shop for food, that he sometimes

16  "makes himself sandwiches and uses the microwave," and "that he takes care of a kitten." *See id*.

17  at 4-5. Defendant also places great emphasis on seeking out various statements by Plaintiff that, in

18  Defendant's view, tend to contradict the limitations opined by Drs. Weibe and Aames. *See id*. at 5-

19  7. As to the last contention, Defendant is essentially grasping at straws by attempting to find

20  avenues where further administrative proceedings are necessitated where none exist such as by

21  noting that "[d]espite allegations of not being able to be around people, Plaintiff told his treatment

22  providers [that] he spends 'most of his days doing or selling his art." *Id*. at 6. Or, by way of

23  another example, Defendant posits that further administrative proceedings are necessary because,

24  in 2016, Plaintiff reportedly told Dr. Dixit that he could shop for food, whereas, in 2017, he

25  reportedly told Dr. Weibe that he does not shop for food. *Id*. In short, based on reasoning of this

26  sort – that is, in order to solve such mysteries as whether or not Plaintiff has ever made himself

27  sandwiches, used a microwave oven, or cared for a kitten – Defendant submits that further

28  administrative proceedings are needed. For the reasons discussed below, the court disagrees.

1       Initially, the court will note that the ALJ in this case rejected the non-examining

2   consultative opinion rendered by Dr. Patterson "because she did not have the opportunity to

3   examine the claimant or to consider the entire record." *AR* at 20. Accordingly, Defendant's

4   reliance on the fact that, in 2016, two non-examining consultants (Drs. Amado and Patterson) –

5   having reviewed an unspecified portion of Plaintiff's medical file – opined that Plaintiff suffers

6   only from mild limitations is unpersuasive (if only for the reasons that the ALJ gave when

7   rejecting Dr. Patterson's opinion). As to the notion of making sandwiches, using a microwave, or

8   caring for a kitten, these are not inconsistencies for which further administrative proceedings are

9   necessary because no matter how many sandwiches Plaintiff has made, or how much time he has

10  spent caring for a kitten, these are not the sorts of activities that can (to any degree) undercut the

11  opinions expressed by Drs. Weibe, Howard, and Aames. In fact, the only record-evidence that

12  warrants any discussion whatsoever in this context is the opinion rendered in August of 2016 by

13  Dr. Dixit, in which she opined that Plaintiff's conditions are attended with little to no limitations at

14  all. In this case, the ALJ rejected the opinions rendered by Drs. Howard, Weibe, and Aames while

15  giving controlling weight to the opinions of Dr. Dixit and one of the two non-examining state

16  agency consultants (Dr. Amado). *See AR* at 19-20.

17      Medical opinions are "distinguished by three types of physicians: (1) those who treat the

18  claimant (treating physicians); (2) those who examine but do not treat the claimant (examining

19  physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."

20  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The medical opinion of a claimant's treating

21  provider is given "controlling weight" so long as it "is well-supported by medically acceptable

22  clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

23  evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Revels*, 874 F.3d at

24  654. In cases where a treating doctor's opinion is not controlling, the opinion is weighted

25  according to factors such as the nature and extent of the treatment relationship, as well as the

26  consistency of the opinion with the record. 20 C.F.R. § 404.1527(c)(2)-(6); *Revels*, 874 F.3d at

27  654.

28      "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must

15

state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id*. (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Further, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831; *see also Revels*, 874 F.3d at 654-55; *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006); *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993). In situations where a Plaintiff's condition progressively deteriorates, the most recent medical report is the most probative. *See Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986).

It will not be necessary to determine whether or not the later-rendered findings and opinions of Dr. Aames (Plaintiff's treating psychologist) and Dr. Weibe (examining consultant) were "contradicted" by the earlier-rendered opinion of Dr. Dixit because the ALJ's explanations for rejecting this evidence did not even rise to the standard of specific and legitimate reasons supported by substantial evidence because, in light of the record as a whole (namely, Dr. Aames's extensive several-year treatment relationship with Plaintiff, coupled with the consistent opinions rendered by Drs. Weibe and Howard) it cannot be reasonably said that Dr. Dixit's outlier and conclusory opinion, by itself, constitutes "substantial evidence." Or, put another way, it is simply not possible to conclude – in light of the test results, findings, and consistent opinions rendered by Drs. Howard, Weibe, and Aames – that Dr. Dixit's opinion by itself can be characterized as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" to the

1    effect that Plaintiff's conditions are attended with little to no limitations. *See Biestek*, 139 S. Ct. at

2    1154.

3           The ALJ in this case made no shortage of errors. First, the ALJ failed to consider

4    Plaintiff's PTSD and schizoaffective disorder at Step Two and beyond. *See AR* at 13-14. Second,

5    it was error for the ALJ to give controlling weight to the opinions of Dr. Dixit and Dr. Amado, the

6    non-examining consultant, and to exclusively base the Step Three analysis and the RFC findings

7    on those opinions given the fact that they are contradicted by the overwhelming weight of the

8    medical evidence as discussed above. Further, as mentioned above, those opinions cannot by

9    themselves constitute substantial evidence that justifies the rejection of the consistent and well-

10   founded opinions of Plaintiff's treating physician, as confirmed and corroborated by two

11   independent examining physicians. In short, the ALJ's decision to reject the opinions of Drs.

12   Aames, Weibe, and Howard rested on the faulty reasoning described above as well as a near-

13   complete misapprehension of the record. Nor are these opinions in any way called into question by

14   the making of sandwiches, the use of a microwave oven, the occasional production and selling of

15   drawings, or providing care for a kitten. Accordingly, the court now finds that the opinions of Drs.

16   Aames, Weibe, and Howard are due to be credited-as-true as a matter of law.

17   **Nature of Remand**

18          The decision whether to remand for further proceedings or for payment of benefits

19   generally turns on the likely utility of further proceedings. *Carmickle v. Comm'r, SSA*, 533 F.3d

20   1155, 1169 (9th Cir. 2008). A district court may "direct an award of benefits where the record has

21   been fully developed and where further administrative proceedings would serve no useful

22   purpose." *Smolen*, 80 F.3d at 1292.

23          The Court of Appeals for the Ninth Circuit has established a three-part test "for

24   determining when evidence should be credited and an immediate award of benefits directed."

25   *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Remand for an immediate award of

26   benefits is appropriate when: (1) the ALJ has failed to provide legally sufficient reasons for

27   rejecting such evidence; (2) there are no outstanding issues that must be resolved before a

28   determination of disability can be made; and, (3) it is clear from the record that the ALJ would be

United States District Court
Northern District of California

17

1   required to find the claimant disabled were such evidence credited. *Id.* The second and third

2   prongs of the test often merge into a single question; that is, whether the ALJ would have to award

3   benefits if the case were remanded for further proceedings. *Id.* at 1178 n.2; *see also Garrison v.*

4   *Colvin*, 759 F.3d 995, 1021-23 (9th Cir. 2014) (when all three conditions of the credit-as-true rule

5   are satisfied, and a careful review of the record discloses no reason to seriously doubt that a

6   claimant is, in fact, disabled, a remand for a calculation and award of benefits is required). Here, in

7   light of the above-discussed and improperly discredited medical opinion evidence, two things are

8   clear: first, it is clear that Plaintiff has in fact been disabled since his alleged onset date, and

9   second, it is clear that further administrative proceedings would be useless because the ALJ would

10  be required to find Plaintiff disabled on remand. Plaintiff's major depressive disorder, his PTSD,

11  and his intellectual disability would undoubtedly compel independent disability findings at Step

12  Three because they each clearly meet the criteria for the three relevant listings, to wit: Listing

13  12.04(A)(1) (depressive disorder), Listing 12.15 (trauma-related disorders), and Listing 12.05

14  (intellectual disorder)). *See* 20 C.F.R. Pt. 404, Subpt. P, app. 1, §§ 12.04, 12.05, 12.15.

15          The first reason that further administrative proceedings would be useless is that based on

16  the improperly discredited evidence, Plaintiff's condition clearly meets the criteria of Listing

17  12.04(A)(1) pertaining to depressive disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04.

18  To satisfy the criteria of Listing 12.04 – it is necessary to satisfy the pertinent criteria listed in

19  subparts (A)(1) and (B), or (A)(1) and (C). *See id.* Subpart (A) requires medical documentation of

20  a depressive disorder, characterized by five or more of the following: depressed mood; diminished

21  interest in almost all activities; appetite disturbance with change in weight; sleep disturbance;

22  observable psychomotor agitation or retardation; decreased energy; feelings of guilt or

23  worthlessness; difficulty concentrating or thinking; or thoughts of death or suicide. § 12.04(A). As

24  discussed above, Drs. Aames, Howard, and Weibe found that Plaintiff met eight of these criteria,

25  basically every category with the exception of disturbances of the appetite. *See AR* at 525-31, 537.

26  Turning to Subpart (B) of Listing 12.04, that provision requires: extreme limitation of one, or

27  marked limitation of two, of the following areas of mental functioning: understanding,

28  remembering, or applying information; interacting with others; concentrating, persisting, or

United States District Court
Northern District of California

1 │ maintaining pace; adapting or managing oneself. § 12.04(B). Drs. Aames, Howard, and Weibe

2 │ found marked limitations in all four of these categories. *See AR* at 427, 535, 538-39. Thus,

3 │ Plaintiff's depression has clearly been disabling under Listing 12.04(A)(1) and (B) since his

4 │ alleged onset date.

5 │   The second reason that further administrative proceedings would be useless is that

6 │ Plaintiff's PTSD also meets or equals the criteria of Listing 12.15. As was the case above, in order

7 │ to satisfy the criteria for listing-level PTSD under §12.15 – it is necessary to satisfy the pertinent

8 │ criteria listed in subparts (A) and (B), or (A) and (C). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1,

9 │ §12.15. The first part of Listing 12.15(A) requires meeting all of the following criteria: exposure

10 │ to actual or threatened death, serious injury, or violence; subsequent involuntary re-experiencing

11 │ of the traumatic event (e.g., intrusive memories, flashbacks, or dreams); avoidance of external

12 │ reminders of the event; disturbances in mood and behavior; and, increases in arousal and reactivity

13 │ (e.g., exaggerated startle response or sleep disturbance). *Id.* Once again, as discussed above, Drs.

14 │ Aames and Weibe found that Plaintiff met all of these criteria as a result of the interaction between

15 │ the trauma he experienced due his childhood sexual abuse, his early years spent witnessing the

16 │ violent beatings his mother suffered at his father's hands, his chronic homelessness, his

17 │ intellectual disability, "as well as his psychiatric problems including psychosis, depression,

18 │ anxiety, and trauma and stressor related symptoms." *See AR* at 523-35, 537-40. Subpart (B) has

19 │ the same requirements and criteria discussed above; and, again, Drs. Aames, Howard, and Weibe

20 │ found marked limitations in all four categories. *See id*. at 427, 535, 537. Accordingly, Plaintiff's

21 │ PTSD has also been clearly disabling under Listing 12.15(A) and (B) since his alleged onset date.

22 │   The third reason that further administrative proceedings would constitute nothing more

23 │ than waste of time is that Plaintiff's intellectual disorder also clearly meets or equals the criteria

24 │ set forth in Listing 12.05(B). In order to satisfy the criteria for listing-level intellectual disorder

25 │ under §12.05 – it is necessary to satisfy the pertinent criteria listed in either subpart (A) or (B). *See*

26 │ 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.05. The criteria set forth in Subpart (B) require a full

27 │ scale IQ score of 70 or below; significant deficits in adaptive functioning currently manifested by

28 │ extreme limitation of one, or marked limitation of two of the following areas of mental

United States District Court
Northern District of California

functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself – additionally, the evidence about the current level of intellectual and adaptive functioning should demonstrate or support the conclusion that the disorder began prior to the age of 22. *See id*. at §12.05(B)(1)-(3). In this regard, in January of 2016, Dr. Howard's administering of the WAIS-IV resulted in a full scale IQ score of 61 (*see AR* at 426); and, as mentioned above, Drs. Wiebe, Howard, and Aames found marked limitations in all four of the areas of mental functioning. *See id*. at 427, 535, 538-39. As to evidence of the onset of the disorder prior to the age of 22, Dr. Howard noted that Plaintiff was engaged "in unspecified special education classes in school for learning problems." *Id*. at 424. Additional support is found for this conclusion in Dr. Wiebe's findings to the same effect (*see id*. at 523 "[h]e was teased in school for being slow, being tall, and being in slow classes," *see also id*. at 524 "he was in special education and resource classes for having problems with memory and slow functioning," *see also id*. at 525-26 "presenting as very childish, immature, and teenage-like," *see also id*. at 531 "[h]e has long term problems with depression, anxiety, learning, and attention," and, *see also id*. at 532 "[his] cognitive functioning impairments appear to result from [a] history of learning problems including likely intellectual disability since childhood."). Thus, Plaintiff's intellectual disorder has also been clearly disabling under Listing 12.05(B) since his alleged onset date.

As for the fourth reason that the record conclusively establishes that Plaintiff has been disabled since his alleged onset date, even if one were able to overlook the fact that his mental impairments clearly satisfy the above-described listings, the combination of his mental impairments would also compel a disability finding during the formulation of the RFC. Given the fact that the improperly rejected evidence established marked limitations in all of the areas of mental functioning, the inescapable conclusion is that Plaintiff has had no residual capacity to function in the workplace at all. This conclusion would be compelled by Dr. Wiebe's finding that Plaintiff's "psychiatric and cognitive problems will likely impair his ability to work for at least two years." *AR* at 532. Similarly, Dr. Aames found that even with medication and psychotherapy, Plaintiff can be expected to show only marginal adjustment in that he has only a minimal capacity

20

1   to adapt to changes in his environment or to demands that are not already part of his daily life. *Id*.

2   at 540.

3   Turning to the fifth and final reason that further proceedings would be futile – when the

4   improperly rejected evidence is given effect, the ALJ would be required to find Plaintiff disabled

5   at Step Five based on the VE's testimony. As mentioned above, at the hearing before the ALJ,

6   when the VE was asked whether there would be any possibility of employment in the national

7   economy for a person such as Plaintiff but with an allowance for that person to be off-task 25% of

8   the workday while being allowed to miss work entirely "at least three times a month unscheduled

9   and unexcused," the VE responded in the negative. *Id*. at 196. Given that Dr. Aames concluded

10  that Plaintiff would be off-task more than 30% of the time, and that he would be absent from work

11  due to his symptoms or treatment more than 4 days per month (*see id*. at 539), then a disability

12  finding at Step Five based on the VE testimony would be unavoidable because if there is no work

13  for a person who is off-task for 25% of the time and absent 3 days per month, then there is

14  definitely no work for a person who will be off-task and absent to a greater degree than that. Thus,

15  on remand, Plaintiff would also be found disabled at Step Five based on the testimony of the VE.

16  At this juncture, the court will note that in cases where each of the credit-as-true factors is

17  met, it is generally only in "rare instances" where a review of the record as a whole gives rise to a

18  "serious doubt as to whether the claimant is actually disabled." *Revels*, 874 F.3d at 668 n.8 (citing

19  *Garrison*, 759 F.3d at 1021). This is not one of those "rare instances," as the record leaves no

20  room to doubt that Plaintiff has in fact been disabled, at least since his alleged onset date, if not

21  much earlier. Needlessly remanding a disability claim for further unnecessary proceedings would

22  only delay much needed income for claimants such as Plaintiff who are unable to work and who

23  are entitled to benefits; doing so would in turn subject them to "tremendous financial difficulties

24  while awaiting the outcome of their appeals and proceedings on remand." *Varney v. Sec'y of*

25  *Health & Human Servs.*, 859 F.2d 1396, 1398 (9th Cir. 1988). Thus, the law in this Circuit does

26  not permit a case like this to be remanded for no reason other than to allow an ALJ a nugatory

27  opportunity to inquire into trivial details of the sort that Defendant has mentioned, or even for a

28  needless attempt at finding out why Dr. Dixit's opinion stood in such contrast to the opinions of

United States District Court
Northern District of California

21

Plaintiff's treating psychotherapist (Dr. Aames) and two independent examining psychologists (Drs. Wiebe and Howard). The court is satisfied that Dr. Dixit's opinion was thoroughly negated by the overwhelming tide of the record evidence in this case and that no further inquiry is necessary in that regard. Therefore, at this juncture, and given the state of the record in this case, the court can conceive of no legitimate reason for any further administrative proceedings, as Plaintiff is undoubtedly disabled and therefore in dire need of financial assistance. *See Benecke*, 379 F.3d at 595 ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication.").

## CONCLUSION

Accordingly, for the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 38) is **GRANTED**, and Defendant's Cross-Motion seeking remand for further proceedings (dkt. 39) is **DENIED**. The ALJ's finding of non-disability is **REVERSED** and the case **REMANDED** for the immediate calculation and payment of appropriate benefits.

**IT IS SO ORDERED.**

Dated: March 9, 2021

ROBERT M. ILLMAN
United States Magistrate Judge

United States District Court
Northern District of California